IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

UNITED STATES OF AMERICA,

            Plaintiff

v.

COREY THOMAS,

            Defendant.

REPORT AND
RECOMMENDATION

08-cr-87-bbc-02

---

## REPORT

The grand jury has charged Corey J. Thomas and three co-defendants with two armed bank robberies and associated charges. *See* dkt. 50. Before the court for report and recommendation is Thomas's motion to quash his arrest and suppress evidence obtained therefrom, namely a cellular telephone, $13,000 cash, the statements made by the three men arrested with him (who are not the co-defendants) and all of their footwear. *See* dkt. 29. As discussed below, the challenged searches exceeded the bounds of an acceptable *Terry* pat down.[1] Whether suppression is the appropriate remedy is a close question in light of the Supreme Court's retrenchment of the exclusionary rule, most recently in *Herring v. United States*, ___ U.S.___, ___ S.Ct. ___, 2009 WL 77886 (Jan. 14, 2009), decided after briefing concluded on Thomas's motion. What tips the balance toward suppression is that this phase of the investigation was based on a trap and trace order issued at least partly in reliance on a misstated material fact regarding a cellular telephone suspected to be possessed by one of the bank robbers. As a result, I am recommending that the court grant Thomas's motion to suppress.

---

[1] *Terry v. Ohio*, 392 U.S. 1 (2000).

This court held an evidentiary hearing on Thomas's motion on October 20, 2008. Having heard and seen the witnesses testify, having reviewed all the exhibits and other evidence,[2] and having made credibility determinations, I find the following facts:

FACTS

At about 10:00 a.m. on May 21, 2008, three African-American men wearing masks and brandishing firearms robbed US Bank in Blooming Grove, Wisconsin, taking over $130,000. One robber left a shoe print on the tellers' counter. During their investigation, deputy sheriffs quickly deduced that a fourth man had been involved in the robbery: Michael Simmons, ostensibly a bank customer that morning, but actually an accomplice who had been left behind. Simmons uses a wheelchair.

Initially, deputies questioned Simmons as an eyewitness. Simmons reported that he was at the bank waiting for his friend Lamar Liggons to pick him up. Simmons described the robbers' getaway vehicle as a blue van, which was consistent with other witnesses' descriptions. In response to an APB broadcast about the getaway van, the Fitchburg Police Department reported that on May 19, 2008 at about 3:00 a.m. an officer had stopped a blue van with Texas license plates. The driver was Lamar Liggons, a front seat passenger was Alisha McDaniel and in the back, in a wheelchair, sat a man named Michael Simmons. The van's occupants were searching for McDaniel's mother's residence on Carling Street. A comparison of the traffic stop video to the bank surveillance video showed that the pants that Liggons was wearing on May 19 were similar to those worn by one of the bank robbers on May 21.

---

[2] I am granting the government's motion to supplement the record with the state court pen register affidavit and order, *see* dkt. 76 and have considered the facts contained therein. If we didn't deal with this document now, the parties would be dealing with it under 28 U.S.C. §636(b)(1)(C).

Sheriff's Detective Dawn Johnson tracked down and interviewed McDaniel's mother, a woman named Diane Wilson. Wilson explained that McDaniel, who lived in Chicago, arrived at her home very early on May 19 with two African-American men named Lamar and Mike (who used a wheelchair). Lamar was about 5'5" to 5'6" tall. According to Wilson, her daughter stayed home with her for most of the next several days, while the two men came and went frequently. The two men left the residence at about 9:00 p.m. on Tuesday night, May 20. Wilson never saw Mike again but she saw Lamar on May 21 around noon when he picked up McDaniel and they returned to Chicago.

During their stay at Wilson's house, Lamar and Mike made and received a large number of calls on Wilson's telephone. Wilson reviewed the numbers stored in her phone's caller ID, and identified a set of 17 telephone calls from a number unknown to her: 608-228-2385. Wilson concluded that these were the calls received by Lamar, Alisha and Mike. *See* transcript, dkt. 54, at 24 -25, 37-38.

Early the next day, May 22, 2008, the lead investigator, Sheriff's Detective Steve Wegner, sought and obtained a state court trap and trace order that allowed deputies to use cellular telephone transmission towers to locate and track the target telephone associated with 608-228-2385 (the "target telephone"). By then, additional evidence had been uncovered that had caused the deputies to arrest Simmons as a party to the crime of armed bank robbery. Detective Wegner reported to the court that "Wilson also knew Liggons cell phone number as 608-228-2385." *See* dkt. 76, attachment 1. This was an inaccurate report of what Wilson actually had told Detective Johnson.[3]

---

[3] According to Detective Johnson, Wilson "did not know whose number this was and that she knew they had been talking on the phone while they were staying at her house. Because she didn't know the number, this had to be an associate of . . Mike, Alisha and/or Lamar." Wilson reported that all three of them had received calls from this telephone. Dkt. 54 at 37-38.

In the order, the court states, among other things, that "there is probable cause to believe that the physical location of the target cellular telephone will reveal evidence of the Armed Robbery . . .." Detective Wegner did not file a complaint or seek an arrest warrant for any person. His intent in seeking this order was to locate a specific telephone, not a specific person.

That same day, the Wisconsin Department of Justice's Division of Criminal Investigation (DCI) joined the investigation. A DCI employee at a fixed location obtained information from area cell towers to determine which side of which tower was picking up signals from the target telephone when it made or received a call, powered up or shut down. This tower information narrowed the location of the target telephone to an arc extending out from the tower one to five miles. DCI's tower-monitoring agent relayed this information to a DCI technical agent, Jody Wormet, who was chasing the target telephone in a van containing equipment that would allow him to track the telephone's movement more precisely once Wormet got it within the two-to-three block range of his more sensitive equipment. Agent Wormet's equipment included a screen that showed a targeted telephone's actual location, movement and direction in real time.[4] Agent Wormet took a one week class to train him how to use his equipment and has used it over 150 times since July 2005. In his experience, this tracking equipment has been successful 100% of the time when attempting to locate a mobile telephone.

On May 22, 2008, a convoy of Dane County deputy sheriffs and other state law enforcement officers accompanied Agent Wormet's van as cell tower information tracked the target telephone northeast through Beaver Dam, Waupun, then Fond du Lac.

Information from a Fond du Lac cell tower indicated that the target telephone phone was within two miles. Agent Wormet drove through the area following a grid pattern, trying to

---

[4] The government objected on confidentiality grounds to providing more detailed information about the equipment and this court upheld many of these objections over Thomas's protests.

4

detect the target telephone with his mobile tracking equipment. Agent Wormet picked up the signal and determined that the target telephone was located in a vehicle parked at a Kwik Trip gas station on West Johnson Street in Fond du Lac. Agent Wormet drove to the gas station and circled the gas pump island at a distance of 30-40 feet. Based on the location and strength of the signal he obtained while circling, Agent Wormet concluded that the target telephone was in a vehicle at the pump island. Agent Wormet observed three African-American men talking to each other outside of two cars at the island. Based on Agent Wormet's knowledge of the descriptions of the bank robbers he concluded that these men were the suspects and that one of them possessed the target telephone. Agent Wormer noticed other vehicles at the island but did not pay attention to them.

As the two cars began to leave the gas station, the signal that Agent Wormet was receiving from the target telephone changed in direction and strength in a manner consistent with the cars' exit. Agent Wormet alerted his convoy. About 12 to 15 deputies, state troopers and local law enforcement agents (collectively referred to hereafter as deputies) rushed to the scene in their vehicles and blocked the two cars. The deputies considered the occupants of the two cars to be armed and dangerous, so they drew and aimed their weapons, ordered the occupants out of both cars and handcuffed them. Corey Thomas and Preston Dixon were in one car, Eric Reed and Jason Jordan were in the other. As far as the lead agent Detective Wegner was concerned, the four men were under arrest and were subject to searches incident to arrest.[5]

---

[5] Detective William Hendrickson, who also participated in this seizure, agreed that all four men were arrested and taken into custody; Detective Johnson asserted that none of the suspects actually was under arrest although all four were handcuffed and subsequently transported in custody to the local police station for questioning.

Detective Kathy Dorn patted down Thomas, felt a cell phone in his pocket and retrieved it without opening it. Detective Wegner called the number of the target telephone; Thomas's telephone rang. Officer Dorn also believed that she had felt wads of cash in two of Thomas's pants pockets but she did not retrieve them. Simultaneously, Detective Johnson was thoroughly searching the vehicle that Thomas had been driving, looking for any evidence of the bank robbery. (Detective Hendrickson was searching the second car incident to arrest, found a cell phone it and checked its database for recent calls). Because Deputy Johnson was in charge of retrieving evidence associated with Thomas, Officer Dorn summoned Detective Johnson to perform a second pat down of Thomas. Detective Johnson also felt what she thought were large wads of cash in Thomas's two front pockets and removed them: they were, indeed, wads of cash. Deputies found a third wad of cash in Thomas's back pocket; all told, Thomas had been carrying about $13,000.

Deputies transported all four men, in cuffs, to the Fond du Lac police department, *Mirandized* and interrogated them and confiscated their shoes to compare to the shoe print left on the bank counter. Thomas is approximately 6'2" and weighs over 200 pounds, Reed is 5'7" and 172 pounds., Dixon is 5'10" and 150 pounds. Jordan, is 6'0" tall and 160 pounds. Reed, Dixon and Jordan were not involved in the bank robberies.

ANALYSIS

Thomas argues that he was arrested and searched without probable cause, and that all evidence seized from him must be suppressed. *See* dkts. 60 & 72.[6] The government disagrees, claiming that the gas station encounter qualifies as an investigative detention that only required

---

[6] Thomas no longer is claiming standing to suppress statements or other evidence obtained from Dixon, Reed or Jordan.

reasonable suspicion and that the target telephone and cash were recovered during a series of allowable weapon pat downs. *See* dkt. 68.

As a starting point, let's remove from the analysis two issues that appear to be undisputed. First, the deputies did not have probable cause to arrest Thomas at the time that they performed a felony stop of his car. The government tacitly concedes this point in its brief, arguing only that there was reasonable suspicion for a *Terry* stop and that under the totality of circumstances, the detention and subsequent searches were not unreasonable. Second, even if there were to have been a Fourth Amendment violation, Thomas's remedy in this prosecution is limited to the suppression of physical evidence; he cannot challenge his own presence before this court. *See United States v. Crews*, 445 U.S. 463, 474 (1980). Thomas does not seriously contend otherwise, despite the title of his motion.

These are the questions that the court needs to answer: Was there reasonable suspicion to stop Thomas's car? If not, does the good faith doctrine nonetheless justify this stop? If a *Terry* stop was justified, did either the amount of force and restraint used, or the scope of the subsequent searches exceed the permissible bounds of an investigative detention? In light of *Herring*, even if the deputies violated Thomas's Fourth Amendment rights, does this violation require exclusion of evidence?

Let's start with a definition of reasonable suspicion sufficient to justify a *Terry* stop:

> The Fourth Amendment protects against unreasonable searches and seizures. Police are permitted, however, to make investigatory stops limited in scope and executed through the least restrictive means reasonable, referred to as *Terry* stops. *Terry* stops are permissible so long as they are supported by reasonable and articulable suspicion that the suspect has committed a crime or is about to do so. Reasonable suspicion is less than probable cause, but more than a hunch. In evaluating the reasonableness of a *Terry* stop, we examine the totality of the circumstances known to

>the officer at the time of the stop, including the experience of the officer and the behavior and characteristics of the suspect.

*United States v. Grogg*, 534 F.3d 807, 810 (7th Cir. 2008).

There is no bright line separating an investigative detention from a formal arrest; the distinction hinges on the intrusiveness of the detention, which is a flexible and highly fact-intensive inquiry. *Jewett v. Ander*, 521 F.3d 818, 823 (7th Cir. 2008). In determining whether the deputies' actions toward Thomas were reasonably related in scope to the circumstances which justified the interference in the first place, courts must bear in mind that an investigatory stop can involve a measured use of force because a necessary corollary of the right to conduct an investigatory stop is the ability to use reasonable means to effectuate it. Therefore, a measured use of force appropriate to accomplish the purposes of the investigatory stop does not convert a *Terry* stop into an arrest. However, the use of force might escalate to the point where the encounter becomes, as a matter of law, a formal arrest. In differentiating between the two, the touchstone is reasonableness: were the deputies' actions reasonable in light of all the circumstances? In evaluating whether the force used was so disproportionate to the purpose of such a stop as to convert the encounter into a full arrest, courts consider whether the surrounding circumstances gave rise to a justifiable fear for personal safety, and whether the defendant resisted or evaded the officers. *Id.* at 824-25. To require deputies to risk their lives in order to make an investigatory stop would run contrary to the intent of *Terry*; therefore, deputies may conduct a pat-down search if they have articulable facts that lead them to believe that the suspect could be armed or present a threat to others. *Id.* at 825.

For instance, in *United States v. Tilmon*, 19 F.3d 1221 (7th Cir. 1994)(a case out of this court), a solo bank robber described as armed and dangerous fled in a distinctive muscle car. Two hours after the robbery and 50 miles distant, officers noticed a matching car driven by a man matching the general description of the robber (young black male, 5'10", 160 lbs.); the driver slid down in his seat when a patrol car pulled up next to him on the highway to look at him. About five police cars stopped the car on the highway, ordered the suspect out of his car at gunpoint, and handcuffed him while holding a shotgun to his head. The court held that this full felony stop had not exceeded the bounds of a *Terry* stop. The court noted that it has adopted a sliding scale approach so that stops too intrusive to be justified by suspicion under *Terry* but short of custodial arrest, were reasonable when the degree of suspicion was adequate in light of the degree and the duration of the restraint. *Id.* at 1226. As the court observed,

> When effecting a *Terry* stop, which is always a stop made at "close range," police officers must make a quick decision about how to protect themselves and others from possible danger. They are not necessarily required to adopt alternative means to ensure their safety in order to avoid the intrusion involved in a *Terry* encounter. A court in its assessment should take care to consider whether the police are acting in a swiftly developing situation, and in such cases the court should not indulge in unrealistic second-guessing.

*Tilmon*, 19 F.3d at 1225.

Against this backdrop, let's examine the instant case. In a nutshell, Thomas and his companions were subjected to a high-risk felony stop, followed by searches incident to arrest, all based on evidence that did not rise to a reasonable suspicion. The lack of reasonable suspicion has its roots in a law enforcement miscommunication about what Wilson had said about the target telephone. Detective Wegner believed that Wilson had reported that this

9

telephone belonged to Liggons, a prime suspect in the bank robbery. But Wilson had told Detective Johnson that she did not know whose phone this was; her recollection was that Liggons had *received* calls from this phone, as had Simmons and McDaniel.[7] Despite what the deputies told the state court, they did not have any evidence that this telephone actually belonged to or was being used by one of their bank robbers. Almost everything that followed was based on this avoidable mistake.

    At best, the deputies had a strong hunch that the target telephone could belong to one of the two unknown bank robbers. So what's the difference between a strong hunch and a weak reasonable suspicion? Perhaps the answer depends on what the police do with it. Using the Seventh Circuit's sliding scale calculus, maybe a strong hunch can be deemed weak reasonable suspicion if the police approach their suspect circumspectly rather than at full tactical strength. More on this in a moment. Regardless which label the court pastes onto the deputies' evidence regarding the target telephone, this evidence was circumstantial and inferential: during a two-day visit to Dane County, two bank robbery suspects and a non-suspect each took a total of 17 calls from an unknown cell telephone with a local area code. The suspects had two unknown accomplices. Perhaps one of the unknown accomplices had been calling them to plan the robbery. But then why was the non-suspect, McDaniel, taking calls? Was she actually talking to the caller or was she just taking messages for Liggons and Simmons? The deputies didn't know. Could this have been someone else calling, for instance, a local drug dealer with whom the robbers were attempting to set up a post-robbery drug transaction in order to launder the

---

[7] Hindsight is irrelevant to a suppression analysis, but Wilson's report comports with reality, since it would have been Thomas using this telephone to call Simmons, Liggons and perhaps McDaniel.

cash and increase their profits?  Or was this drug dealer repeatedly calling to insist that Liggons and Simmons square a front, which drove them to commit a bank robbery?  Were the calls from a persistent girlfriend or relative trying to set up a meeting with a visiting loved one?  Each of these speculative scenarios is equally possible and plausible.

In any event, the deputies obtained a trap-and-trace order from the state court that allowed them to attempt to locate the telephone and its holder.[8]  The day after the robbery, using technology that either is prosaically old school (the court's view) or "voodoo" (defense counsel's view), a caravan of law enforcement officers led by a DCI tech agent chased the telephone northeast up Highway 151 to Fond du Lac.  Using the target telephone essentially as a "beeper," the tech agent was able to pinpoint its location to a pump island at a gas station.  Considering that the agent completely circled the pump to verify his readings, there can be little doubt that he had the right location.

Whether Agent Wormet focused on the right cars has led to a race-tinged flare-up between counsel, *compare* dkt. 68 at 7, n.4 *with* dkt. 72 at 4.  Agent Wormet recalls that there were other cars at the pumps, but he focused quickly and exclusively on the three black men chatting next to two of the cars.  I infer that Agent Wormet focused on them because they were the only African-American men at the pumps.[9]  Even if this is true, this would not constitute

---

[8] Thomas did not challenge issuance of the order under *Franks v. Delaware*, 438 U.S. 154 (1978) and it's too late to do so now, *see* F.R. Cr. P. 12(c) & (e).  On the other hand, neither may the government rely on *United States v. Leon*, 468 U.S. 897 (1984), *see* dkt. 68 at 6, n.2 because the court's order was based on the applicant's misstatement of a material fact. *Cf. United States v. Garey*, 329 F.3d 573, 577 (7th Cir. 2003).

[9] In 2006, African Americans constituted 1.9% of the population of the City of Fond du Lac. *See* http://quickfacts.census.gov/qfd/states.  If there *had* been other African-American men at the pumps, then the agent would be hard-pressed to explain why he picked out these three men and their vehicles as the investigative targets.

11

improper racial profiling on these facts. This is not a situation where the bank robbers' race was unknown and the deputies chose to focus on the black motorists because they were black; rather, the deputies knew that the four bank robbers were African-American, so common sense indicated that any whites, Asians, Native Americans or Hispanics at the pumps could be ruled out as direct suspects.

Thomas also argues that other than being black, these tall men did not come close to meeting the height and weight descriptions for the shorter Liggons. But this entire seek-and-detain exercise was based on the erroneous surmise that Liggons possessed the target telephone when in fact the evidence was that Liggons did *not* have this telephone, someone else did. Therefore, the deputies should *not* have been looking for a person matching Liggons's description, and they had no descriptors at all regarding the person possessing the target telephone other than their assumption that he must be a black male, based on their other assumption that one of the bank robbers possessed the telephone.[10] (As an aside, based on what Wilson actually had told Detective Johnson, incorrectly searching for Liggons instead of a third party is not the sort of "reasonable but mistaken assumption" addressed by the court in *Herring v. United States*, 2009 WL 77886 at *4, because here the deputies had generated the correct information themselves a day earlier and must be held to have known it under the collective knowledge doctrine. *See United States v. Whitaker*, 546 F.3d 902, 905 (7th Cir. 2008).)

---

[10] Which perhaps lead us to the juncture decried in *United States v. Prideaux-Wentz*, 543 F.3d 954, 960-61 (7th Cir. 2008): each inferential leap diminished the value of the evidence so that virtual certainty became probability, which merged into possibility, which faded into chance.

Even so, it would not have been unreasonable at this juncture to initiate a police-citizen encounter to explore a bit further. The deputies were in warm pursuit of armed bank robbers and had a strong hunch/weak reason to suspect that the men at the gas station were associated with the bank robbers. Returning to the two-variable calculus employed by the Seventh Circuit for *Terry* stops, an approach commensurate to the weakness of the evidence perhaps could have been deemed reasonable. But the deputies, for their own safety, initiated a highly intrusive full felony stop of the two cars. Under *Tilmon*, this is not necessarily a constitutionally unreasonable approach, but there are sufficient factual differences here to question the appropriateness of the tactics used. This was not hot pursuit from the robbed bank during which the suspects undoubtedly still would have been armed, hypervigilant and potentially trigger-happy. The bank robbery had occurred over 24 hours earlier and 75 miles southwest, and there was no actual evidence that any of the four men in these two cars had participated in the robbery or that they currently were armed. The evidence linking these four men to a crime was that one of these men possessed a cell phone that had called two of the suspected robbers (and a third party) 17 times in the two days prior to the robbery.

Even so, it's not necessarily over for the government; as the court explained in *Tilmon*, courts should be chary of second-guessing split-second decisions made on the scene by trained officers. It would have been difficult to fault the deputies' use of a short burst of overwhelming force intended quickly to take control of the scene and disarm the suspects. But once this was accomplished, given the weak evidence supporting the stop, it would have been reasonable and appropriate for the deputies to holster their firearms, perhaps uncuff the suspects and ask questions to corroborate or dispel their suspicions.

13

But that's not what happened. As 2/3 of the deputies testified (including the lead investigator), they stopped these four men with intent to arrest them, and they did arrest them. The deputies handcuffed all four, searched them incident to arrest and searched their cars incident to arrest. One detective removed a cell phone from a car and searched its memory. Another detective removed a cell phone from Thomas's pocket. There is no evidence that she believed it was a weapon and the "plain feel" doctrine only justifies "seizure of contraband plainly detected through the sense of touch." *Minnesota v. Dickerson*, 508 U.S. 366, 376-77 (1993). The incriminating character of the object must be "immediately apparent" from a pat-down; the officer is forbidden from conducting a further search. *Id.* at 379. In creating this limited expansion to *Terry*, the Court was sensitive to the danger that police would enlarge it into the equivalent of a general warrant to rummage or search at will. *Id.* at 378; *See also United States v. Brown*, 188 F.3d 860, 866 (7th Cir. 1999)("An officer is not justified in conducting a general exploratory search for evidence under the guise of a stop-and-frisk.")

Keep in mind that *Dickerson* says nothing about the suspected evidentiary value of the felt object; the question is whether its incriminating nature is immediately apparent.[11] Therefore, in this age of universal cell phone usage, the fact that Thomas had in his pocket an object that felt like cell phone (or perhaps a PDA) did not give the deputies the right to seize it. Perhaps if Detective Wegner had called the target telephone's number *before* they seized it, this would have been acceptable, but he did not. Also, the fact that two deputies performed two pat downs of

---

[11] *United States v. Hernandez-Rivas*, 348 F.3d 595, 599 (7th Cir. 2003), at first blush seems to suggest that a wad of cash is subject to seizure under the plain feel doctrine, but the deputies actually saw that the wad of paper was currency, then asked the defendant what it was and he told them it was $10,000.

14

the wads of paper in Thomas's pockets before deciding that they must be feeling cash suggests either that the contraband nature was not immediately apparent, or more likely, that Thomas was searched again by Detective Johnson because he was under arrest and she was the evidence custodian for him and his vehicle. The bottom line is that, given the weak evidence of wrongdoing by whoever possessed the target telephone, the detectives exceeded the bounds both of a permissible *Terry* stop and of a permissible *Terry* frisk. As a result, the physical evidence seized from Thomas at the gas station probably should be suppressed.

But there's a final consideration: notwithstanding the overzealousness of the deputies, is this a case in which it would be unreasonable to apply the exclusionary rule? "Paradigm shift" is a trite and often meaningless phrase, but it might be an apt description of the Supreme Court's recent curtailment of the exclusionary rule as illustrated by *Herring v. United States* and *Hudson v. Michigan*, 547 U.S. 586 (2006). Here's the new rule:

> To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the judicial system. As laid out in our cases, the exclusionary rule serves to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence.

*Herring*, 2009 WL 77886 at *7.

The parameters of this new iteration will be determined over time, and perhaps this case will be part of the vanguard. After all, how can you fault tenacious police work that results in the capture of a suspected armed bank robber, even if this capture is the result of some guesses and gut feelings? What sort of police behavior would be deterred by telling the deputies that they cannot use the evidence that they seized from Thomas at the gas station?

But this entire phase of the investigation was based on a miscommunication of a material fact between the investigating detectives and the misstatement of that material fact to the state court in support of the trap-and-trace application. There is no evidence that this was deliberate and I don't doubt that the detectives were putting forth best efforts in good faith in a fast-evolving investigation involving a gang of armed bank robbers. But switching Wilson's statement from "It was not Liggons's phone" to "it was Liggons's phone" in the trap-and-trace application flipped a critical fact in favor of the government. It also led to the detectives significantly overplaying their hand when they stopped, arrested and searched Thomas in the absence of probable cause or even reasonable suspicion.

Finally, one has to ask: is the Supreme Court directing lower courts to become result-oriented in their application of the exclusionary rule? "The deterrent effect of suppression must be substantial *and outweigh any harm to the justice system*." *Id*. at \*9, emphasis added. Absent reckless disregard of constitutional requirements, the criminal should not go free because the constable has blundered. *Id.* Duly noted. It's not clear, however, how to apply this principle in a rational and predictable manner. The most logical conclusion is that the Court is not instructing trial courts to consider the effect of suppression on the government's ability to prosecute its case, but instead admonishing courts only to suppress evidence when the constitutional violation is both clear and capable of being deterred in the future.

This appears to be such a case. Suppressing the fruits of this search should encourage local law enforcement officers more assiduously to present accurate recitations of material facts to courts when seeking investigative orders and search warrants, and also encourage them to be

more mindful of the distinction between arrests and searches justified by probable cause and *Terry* stops and frisks justified by reasonable suspicion.

## RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1)(B) and for the reasons stated above, I recommend that this court grant defendant Corey Thomas's motion to suppress physical evidence and his post-arrest statements.

Entered this 20th day of January, 2009.

BY THE COURT:

/s/

STEPHEN L. CROCKER
Magistrate Judge

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN
120 N. Henry Street, Rm. 540
Post Office Box 591
Madison, Wisconsin 53701

| | |
|---|---|
| Chambers of<br>STEPHEN L. CROCKER<br>U.S. Magistrate Judge | Telephone<br>(608) 264-5153 |

January 21, 2009

Elizabeth Altman
Assistant U.S. Attorney
P.O. Box 1585
Madison, WI 53701-1585

Robert Thomas Ruth
Attorney at Law
7 North Pinckney Street, Suite 240
Madison, WI 53703

  Re: United States v. Corey Thomas
    Case No. 08-CR-087-bbc-02

Dear Counsel:

  The attached Report and Recommendation has been filed with the court by the United States Magistrate Judge.

  The court will delay consideration of the Report in order to give the parties an opportunity to comment on the magistrate judge's recommendations.

  In accordance with the provisions set forth in the newly-updated memorandum of the Clerk of Court for this district which is also enclosed, objections to any portion of the report may be raised by either party on or before January 30, 2009, by filing a memorandum with the court with a copy to opposing counsel.

  If no memorandum is received by January 30, 2009, the court will proceed to consider the magistrate judge's Report and Recommendation.

        Sincerely,

        /s/

        Connie A. Korth
        Secretary to Magistrate Judge Crocker

Enclosures
cc: Honorable Barbara B. Crabb, District Judge

MEMORANDUM REGARDING REPORTS AND RECOMMENDATIONS

Pursuant to 28 U.S.C. § 636(b), the district judges of this court have designated the full-time magistrate judge to submit to them proposed findings of fact and recommendations for disposition by the district judges of motions seeking:

(1) injunctive relief;

(2) judgment on the pleadings;

(3) summary judgment;

(4) to dismiss or quash an indictment or information;

(5) to suppress evidence in a criminal case;

(6) to dismiss or to permit maintenance of a class action;

(7) to dismiss for failure to state a claim upon which relief can be granted;

(8) to dismiss actions involuntarily; and

(9) applications for post-trial relief made by individuals convicted of criminal offenses.

Pursuant to § 636(b)(1)(B) and (C), the magistrate judge will conduct any necessary hearings and will file and serve a report and recommendation setting forth his proposed findings of fact and recommended disposition of each motion.

Any party may object to the magistrate judge's findings of fact and recommended disposition by filing and serving written objections not later than the date specified by the court in the report and recommendation.  Any written objection must identify specifically all proposed findings of fact and all proposed conclusions of law to which the party objects and must set forth with particularity the bases for these objections.  An objecting party shall serve and file a copy

of the transcript of those portions of any evidentiary hearing relevant to the proposed findings or conclusions to which that party is objection. Upon a party's showing of good cause, the district judge or magistrate judge may extend the deadline for filing and serving objections.

After the time to object has passed, the clerk of court shall transmit to the district judge the magistrate judge's report and recommendation along with any objections to it.

The district judge shall review de novo those portions of the report and recommendation to which a party objects. The district judge, in his or her discretion, may review portions of the report and recommendation to which there is no objection. The district judge may accept, reject or modify, in whole or in part, the magistrate judge's proposed findings and conclusions. The district judge, in his or her discretion, may conduct a hearing, receive additional evidence, recall witnesses, recommit the matter to the magistrate judge, or make a determination based on the record developed before the magistrate judge.

**NOTE WELL: A party's failure to file timely, specific objections to the magistrate's proposed findings of fact and conclusions of law constitutes waiver of that party's right to appeal to the United States Court of Appeals.** *See United States v. Hall,* 462 F.3d 684, 688 (7th Cir. 2006).